UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO BRANCH OF NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,<br><br>                              Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, a Subdivision of the State, et al.,<br><br>                              Defendants. | Case No.: 16cv2575-JLS (BGS)<br><br>**ORDER DENYING PLAINTIFFS'** *EX PARTE* **APPLICATION FOR TEMPORARY RESTRAINING ORDER**<br><br>(ECF No. 4) |

Presently before the Court are Plaintiffs' *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause re: Preliminary Injunction ("TRO Appl.") (ECF No. 4), Defendants County of San Diego's and William D. Gore's Response to Plaintiffs' Application for a Temporary Restraining Order ("S.D. TRO Resp.") (ECF No. 6), Defendants City of El Cajon's and Jeff Davis's Opposition to Plaintiffs' *Ex Parte* Application for a Temporary Restraining ("El Cajon TRO Opp'n") (ECF No. 7), and Plaintiffs' Combined Reply in Support of Temporary Restraining Order and Order to Show

/ / /

/ / /

Cause re: Preliminary Injunction ("TRO Reply") (ECF No. 10).  On October 26, 2016 the Court conducted a hearing ("the Hearing") on the arguments raised in the above documents and thereafter took the matter under submission.  Having considered the parties' arguments and the law, the Court Orders as follows.

## BACKGROUND

On September 27, 2016 Alfred Olango was shot and killed in the parking lot of the Broadway Village Shopping Center in El Cajon, California.  (TRO Appl. 4.)  Marches and protests followed, including the erection of a memorial at the parking-lot shooting site.  (*Id.*)  On Saturday, October 1, 2016 many individuals gathered in the parking lot for a "community vigil" in response to Olango's death.[1]  (*Id.*)  Police monitored the gathering, (*see* TRO Appl. 5; S.D. TRO Resp. 2), both via helicopter and in marked and unmarked police vehicles containing officers clothed in riot gear, (TRO Appl. 5; *see id.* at Ex. 1; S.D. TRO Resp. 2).  At approximately 12:00 a.m., the City of El Cajon Police Department determined that the behavior exhibited by the then-dwindled crowd of forty to eighty[2] was sufficiently unruly so as to declare an unlawful assembly pursuant to the California Penal Code.  (S.D. TRO Resp. 2.)  Specifically, Defendants El Cajon and Davis allege that they declared an unlawful assembly because a "physical fight between a group of protestors broke out" and that one of the "individuals involved in the altercation stated that he was going to get a gun."  (El Cajon TRO Opp'n 4.)  Plaintiffs "vehemently dispute" this allegation.  (TRO Reply 10.)

Subsequent to the unlawful assembly declaration, according to Plaintiffs, two lines of Sheriff's deputies "with riot helmets, batons, shotguns and grenades and attack dogs" assembled and blocked two of the three exits from the parking lot, at which point the crowd

---

[1] Plaintiffs allege, and Defendants El Cajon and Davis agree, there were approximately 200 people at the height of the gathering.  (TRO Appl. 4; *see* El Cajon TRO Opp'n 4.)

[2] Plaintiffs allege that approximately eighty people were present when the police helicopter began announcing that the gathering had been declared an unlawful assembly, (TRO Appl. 5); Defendants San Diego County and Gore allege forty to fifty, (S.D. TRO Resp. 2).

further dwindled. (TRO Appl. 5.) The remaining members of the crowd sent a representative to talk with a deputy from the Sheriff's Department. (*Id.*) Around the same time, Plaintiffs allege that deputies told protestors the reason the Department had declared the gathering an unlawful assembly was because law enforcement were tired and it was after midnight. (*Id.*) The Sheriff's Department advised the representative, who in turn advised the remaining crowd members, that only close family could remain at the site and that all others would be arrested. (*Id.* Ex. 1; S.D. TRO Resp. 2.) Certain non-family members in the crowd elected to stay at the site, and the deputies formed a line that slowly moved towards these remaining members. (TRO Appl. 5; Smith Decl. ¶¶ 6–7, ECF No. 6-1.) Plaintiffs allege that around this time Sheriff's deputies tore down posters and knocked over candles at the memorial site. (TRO Appl. 5–6.) Eventually, various remaining individuals were peacefully arrested, including Plaintiffs Eric Bidwell, Eric Burney, Levandis Carter, Michael Feinstein, Jeff Provenzo, Jean Vilsaint, and Ian Whitehouse. (*Id.*)

Subsequently, Defendants El Cajon and Davis allege that from October 2, 2016 to October 13, 2016 there continued to be daily and nightly gatherings at the memorial site. (El Cajon TRO Opp'n 4.) No enforcement action was taken at these gatherings. (*Id.*) Plaintiffs confirmed these facts at the Hearing. (Hr'g Tr. 9:5–11.) Plaintiffs next allege, fourteen days after the October 1, 2016 events, that individuals again gathered at the site of the shooting and the Sheriff's Department again declared an unlawful assembly at approximately 12:00 a.m. (TRO Appl. 6.) This time, however, Plaintiffs dispersed.[3] (*Id.*) Plaintiffs allege that at the time the assembly was declared unlawful "[t]here was no clear and imminent threat of violence." (*Id.*) In sharp contrast, Defendants El Cajon and Davis allege the following regarding the October 15 gathering: (1) at approximately 9:00 p.m. the

---

[3] Defendants El Cajon and Davis note that, subsequent to the dispersal, at 2:30 a.m. two protestors approached officers, asked if they could remove items from the vigil site, and were allowed to do so. (El Cajon TRO Opp'n 5.) Later, the police again allowed the same protestors to remove items from the vigil site. (*Id.*)

group of protestors "blocked the intersection of Broadway and Mollison[;]" (2) several "motorists were stuck at the intersection and were approached by groups of protestors[;]" (3) some "motorists were forced to turn into oncoming traffic lanes and drive on the wrong side of the road to avoid the protestors[;]" (4) "the protestors became violent, attempting to open the door of one vehicle, causing the driver of the car to quickly speed away[;]" (5) the "protestors slashed the tires of another motorist's vehicle, disabling it in the roadway[;]" and (6) sometime during the course of the night the owner of the property "reported he no longer wanted the protestors on his property and requested that they be arrested for trespassing if they refused to leave." (El Cajon TRO Opp'n 4–5.) At the Hearing Plaintiffs admitted to these acts of violence, but noted that the alleged acts occurred at 9:00 p.m., approximately three hours prior to city law enforcement declaring the assembly unlawful.[4] (Hr'g Tr. 34:21–35:7. *Compare* Bates Decl. ¶ 4, ECF No. 7-2, *with* Vilsaint Decl. ¶ 12, ECF No. 4-5.)

Plaintiffs further allege that the following day individuals again returned to the site and found a newly made "Customer Only Parking—No Trespassing" sign on the fence. (TRO Appl. 7.) Additionally, Plaintiff Michael Feinstein alleges that at approximately 2:15 p.m. of the same day he was "approached by the El Cajon Police Chief" Jeff Davis, who arrived in a police car marked "Chief of Police" and told Plaintiff that he was trespassing and would be arrested if he did not leave the site. (*Id.* at 7, 11.) Defendants El Cajon and Davis, again in stark contrast, allege that: (1) Chief Davis "does not drive a marked vehicle[;]" (2) the "department does not have a vehicle with the words 'Chief of Police' displayed on it[;]" (3) "Chief Davis was not at the vigil site on October 16, 2016,

///

///

---

[4] Plaintiffs further argued at the Hearing that the above-listed acts of violence took place "at another location" distinct from where city law enforcement made the unlawful assembly declaration. (Hr'g Tr. 34:21–35:7.) Defendants indicate this location was "the intersection of Broadway and Mollison," which on October 15 was covered by the "incident commander for the protests occurring in the vicinity of 777 Broadway in El Cajon." (*See* Bates Decl. ¶¶ 3–4.)

or any other day[;]" and (4) "Chief Davis did not speak with Michael Feinstein and did not tell anyone that they would be arrested if they did not leave the site at any time." (El Cajon TRO Opp'n 7.)

Finally, Plaintiffs assert that Plaintiff Carl Box returned to the vigil site and was arrested and charged with a violation of California Penal Code section 602(m)—the provision covering "[t]respasses constituting misdemeanors . . . ." (TRO Reply 8.) In support of this assertion, Plaintiffs attach a declaration by Mr. Box and a Bail Receipt from the San Diego Sheriff's Department verifying that Mr. Box was arrested on October 18, 2016 for violating California Penal Code section 602(m). (*See id.* at Ex. 2.)

## LEGAL STANDARD

The same standard governs TROs and preliminary injunctions. *Stuhlbard Int'l Sales Co. v. John D. Brush and Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)); *see also Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). This is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 20. To warrant injunctive relief, irreparable injury must be more than merely possible. *See Midgett v. Tri-Cty. Metro. Transp. Dist. of Or.*, 254 F.3d 846, 850 (9th Cir. 2001). Rather, the plaintiff must show "that he faces a real or immediate threat" that he will suffer irreparable harm. *Id.* Plaintiffs seeking a preliminary injunction carry a particularly "heavy burden" of proving their entitlement to it. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010); *see also Munaf*, 553 U.S. at 689 ("A preliminary injunction is an 'extraordinary and drastic remedy.'").

/ / /

/ / /

# ANALYSIS

In the present case, although both sets of Defendants ultimately argue the Court should not grant Plaintiffs' TRO request, Defendants San Diego County and William D. Gore first contend that the Court should abstain entirely from considering Plaintiffs TRO request under the principles of *Younger v. Harris*, 401 U.S. 37 (1971), and its progeny. Accordingly, the Court first addresses this threshold jurisdictional issue.

## I. *Younger* Abstention

In *Younger* an appellee sought injunctive relief in federal court, effectively challenging a pending state-court indictment and charged violation of the California Penal Code. *Id.* at 38. A three-judge Federal District Court held that it had jurisdiction and power to grant the injunction; but the Supreme Court reversed. *Id.* at 38, 50–54. The Court held that federal courts may not enjoin pending state criminal prosecutions "even if such statutes [under which plaintiffs are charged] are unconstitutional . . . ." *Id.* at 49 (citation omitted); *see also id.* at 54 (noting that the *Younger* principle is supplemental to the prohibition on injunctions set forth in the Anti-Injunction Act, 28 U.S.C. § 2283).

Subsequently, the *Younger* principle has been expanded from pending state criminal prosecutions to pending state civil suits, *see, e.g.*, *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987), and pending state administrative proceedings involving "important state interests," *see, e.g.*, *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 627 (1986). However, the principle is not without limit. The Supreme Court has several times held that *Younger* abstention does not stretch so far as to encompass a Plaintiff seeking either declaratory or injunctive relief in the absence of a pending criminal prosecution. *See Steffel v. Thompson*, 415 U.S. 452 (1974) (holding that when a plaintiff who is merely threatened, rather than charged, with prosecution seeks a declaration as to her rights *Younger* abstention does not apply); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 930 (1975) (holding that two plaintiffs against whom no criminal proceedings were pending were not subject to *Younger*'s restrictions barring declaratory or injunctive relief).

///

In the present case, Defendants County of San Diego and Gore argue that *Younger* abstention is appropriate because "(1) state judicial proceedings are pending; (2) the state proceedings involve important state interests; and (3) the state proceedings afford the federal plaintiff an adequate opportunity to litigate federal constitutional claims." (S.D. TRO Resp. 2–3 (citing *Weiner v. Cty. of San Diego*, 23 F.3d 263 (9th Cir. 1994)).) Defendants draw a fine line. They admit that "Plaintiffs in the present action . . . are not attempting to enjoin the prosecution of the criminal cases involving several of the plaintiffs" and that charges have not been "filed against these plaintiffs . . . ." (*See id.* at 2–3). Defendants instead argue that "Plaintiffs have not stated that any of the criminal charges have been dismissed," and that Plaintiffs "are attempting to thwart potential future criminal cases by way of a TRO by claiming . . . that the underlying arrests were 'false' or unlawful." (*Id.* at 2.)

While Defendants' point is well taken that in order to succeed on the merits of their TRO application Plaintiffs necessarily must contest the validity of the underlying arrests, the logic underlying *Younger* abstention nonetheless does not extend to the facts of this case. Federal courts regularly assess the constitutionality of state statutes, *e.g.*, *Wiener*, 23 F.3d at 266 (continuing preliminary injunction against enforcement of county ordinance and noting for purposes of *Younger* abstention "the critical question is . . . whether 'the state proceedings were underway before initiation of the federal proceedings.'" (citing *Kitchens v. Bowen*, 825 F.2d 1337, 1341 (9th Cir. 1986))), and when a criminal statute is held to be unconstitutional it necessarily follows that individuals previously prosecuted under the now-unconstitutional statute were prosecuted in error. Accepting Defendants' position would thus preclude federal courts from almost ever assessing the constitutionality of state statutes. Plaintiffs in federal court must suffer some direct injury in order to properly avail themselves of federal jurisdiction, *see, e.g.*, *Lujan v. Def.'s of Wildlife*, 504 U.S. 555, 574 (1992) (to satisfy the injury requirement conferring standing under Article III a plaintiff "must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its

enforcement, and not merely that he suffers in some indefinite way in common with people generally"), and barring all individuals from federal court who have been arrested but not prosecuted would effectively place such parties in an impossible position: either *Younger* bars their case because of the arrest, or a lack of an arrest likely bars the conferral of Article III standing. *See Steffel v. Thompson*, 415 U.S. 452, 458–469 (1974) (noting that declaratory judgment's "milder alternative to the injunction remedy" was appropriate under both Article III standing and *Younger* given that Petitioner's friend had been arrested and prosecuted for same underlying activity, thus meaning Petitioner "ha[d] alleged threats of prosecution that cannot be characterized as 'imaginary or speculative'"); *see also id.* at 476 (Stewart, J., concurring) (writing separately to emphasize that cases such as *Steffel* "where such a 'genuine threat of enforcement of a disputed criminal statute . . .' can be demonstrated [in the absence of an arrest] will . . . be exceedingly rare" (footnote omitted)). Moreover, in the present case Plaintiffs are not seeking for this Court to declare unconstitutional the relevant provisions of the California Penal Code, but are instead seeking to stop law enforcement from allegedly <u>incorrectly interpreting and applying the provisions' mandates to Plaintiffs' conduct</u> such that "the State is free to prosecute others who may violate the statute."[5]  *Doran*, 422 U.S. at 931.  Given this posture, the analysis and policy underlying *Steffel* and *Doran* preclude application of *Younger* abstention to the present case where Plaintiffs (1) seek to enjoin <u>future</u> allegedly unconstitutional application of the statute and (2) have been arrested <u>but not yet prosecuted</u>.

Given the foregoing, the Court **CONCLUDES** that *Younger* abstention is inappropriate in the present case.  The Court now turns to Plaintiffs' request for a TRO.

///

///

---

[5] While the language Plaintiffs propose in their TRO Application varies from that actually set forth in California Penal Code section 407, Plaintiffs in part explicitly seek relief in the form of a prohibition on Defendants "declaring ongoing peaceful vigil(s) <u>held by Plaintiffs</u> to be unlawful assemblies under California Penal Code section 407 . . . ." (TRO Appl. 3 (emphasis added).)

## II. TRO Request

Because Plaintiffs' TRO Application requests two separate aspects of relief, and because each aspect implicates slightly different factual predicates, the Court considers each request individually, starting with (A) Plaintiffs' request for an order temporarily restraining law enforcement "from declaring ongoing peaceful vigil(s) held by Plaintiffs to be unlawful assemblies under California Penal Code section 407 unless there is ongoing, uncontrollable violence[;]" and concluding with (B) Plaintiffs' request for an order temporarily restraining law enforcement "from threatening to arrest or arresting any individuals simply for being present at or in the vicinity of 777 Broadway, El Cajon, California . . . ." (TRO Appl. 3.)

### A. Unlawful Assembly; California Penal Code Section 407

Although Plaintiffs characterize as "highly doubtful" Defendants' assertions that law enforcement declared the October 1, 2016 gathering to be an unlawful assembly due to a physical altercation involving someone threatening to return to the site with a gun, Plaintiffs ultimately argue that "[e]ven assuming such incident occurred . . . this does not make an assembly generally unlawful."[6] (TRO Reply 9.) Plaintiffs effectively assert two arguments, one temporal (that sufficient time had passed since the allegedly violent incidents such that the assembly lost its unlawful character), and one based on what should be sufficient for an officer to declare an assembly unlawful under section 407. (*See id.* at 9–13.) However, the Court need not reach these issues because Plaintiffs concede that there have been multiple gatherings at the site—both at day and night—from October 2, 2016 to October 14, 2016.

///

---

[6] The Court need not address Plaintiffs' implications that the Defendants either mistakenly noted or manufactured the report of violence and the individual leaving to get a gun. (TRO Reply 10 (noting that "Plaintiffs vehemently dispute there was any fight on October 1, 2016," and that "[i]t is similarly ludicrous that anyone threatened to 'get a gun'").) There has been no dispositive evidence presented to the Court on this issue, and the lingering sharp factual dispute precludes the Court's ability to say that Plaintiffs demonstrate a likelihood of success on the merits on these grounds.

As set forth above, to warrant injunctive relief irreparable injury must be more than merely possible. *See Midgett*, 254 F.3d at 850. In the present case, Plaintiffs have returned to the vigil site multiple times from October 2, 2016 to October 14, 2016 without law enforcement declaring any assemblies to be unlawful. Further, Plaintiffs do not refute Defendants' assertions that the October 15 gathering—the only other time a gathering at the site was declared an unlawful assembly—gave rise to multiple violent acts, such as slashing tires and attempting to remove motorists from their cars. Accordingly, across a span of approximately fifteen days, the Court is left with only two, sharply disputed accounts of gatherings each declared an unlawful assembly.[7] Such a showing does not satisfy Plaintiffs' burden to show a "likelihood of substantial and immediate irreparable injury." *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974). Therefore, Plaintiffs' request as to the section of their TRO Application addressing California Penal Code section 407 is **DENIED**. The Court turns to Plaintiffs' other request.

### *B. Trespassing; California Penal Code Section 602*

Plaintiffs also request that the Court enjoin law enforcement "from threatening to arrest or arresting any individuals simply for being present at or in the vicinity of 777 Broadway, El Cajon, California, which is a shopping center open to the general public." (TRO Appl. 3.) Plaintiffs support this request with the following facts: (1) Plaintiffs' allegations that law enforcement has warned individuals that returning to the gathering site may result in their arrest for trespassing; and (2) one Plaintiff[8]—Carl Box—has already been arrested.

/ / /

---

[7] Further, Defendants County of San Diego and Gore allege, and Plaintiffs do not refute, that the Sheriff's Department—an arm of the county of San Diego, rather than the city of El Cajon—arrived only "after the El Cajon Police Department declared the assembly unlawful." (S.D. TRO Resp. 5 (emphasis added); *see also* Hr'g Tr. 27:12–17.) Accordingly, on these facts neither the County of San Diego nor Sheriff Gore nor the Sheriff's Department has ever declared an unlawful assembly.

[8] Plaintiffs also allege that they "believe" Mr. Vilsaint was arrested simply for returning to the vigil site. *See infra* note 10 and accompanying text.

On the documents thus far submitted to the Court, Plaintiffs present a plausible argument that on the current facts not only does the offense for which Plaintiff Box was charged—violation of California Penal Code section 602(m)—not apply, but neither do any of the provisions of California Penal Code section 602.[9] *See In re Catalano*, 623 P.2d 228, 234 n.8 (Cal. 1981) (en banc) (explicitly stating that California Penal Code section 602(m) only applies to "attempted dispossession of private property—that is, continuous, nontransient presence"); *see also generally Han v. City of L.A.*, No. CV 14-08582 DDP (AJWx), 2016 WL 2758241, at *5 n.2 (C.D. Cal. May 12, 2016) (thoroughly analyzing all potentially relevant California Penal Code provisions, and noting that in absence of "evidence that Plaintiff was 'intentionally interfering with any lawful business or occupation carried on'" it was "not clear under what statutory section the officers could have reasonably believed there was a basis for arresting Plaintiff"). However, such a showing alone is insufficient to warrant the extraordinary grant of a TRO, *see Winter*, 555 U.S. at 20–24, and in the present case there are fundamental facial and substantive flaws with Plaintiffs' proposed TRO such that Plaintiffs' requested relief would necessarily fall outside the boundaries prescribed by Federal Rule of Civil Procedure 65.

As an initial matter, "blanket injunctions to obey the law are disfavored." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007) (quoting *Mulcahy v. Cheetah Learning LLC*, 386 F.3d 849, 852 n.1 (8th Cir. 2005)); *accord Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 895 F.2d 659, 668 (10th Cir. 1990) ("[G]enerally, injunctions simply requiring the defendant to obey the law are too vague."), *cert. denied*, 498 U.S. 1082 (1991); *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 373 (5th Cir. 1981) ("A general injunction which in essence orders a defendant to obey the law is not permitted."). In accord with this principle, and given the extraordinary nature of injunctive relief, the controlling Federal Rule of Civil Procedure requires a high level of

---

[9] However, Defendants do not concede this point and explicitly noted at the Hearing that they had not had a chance to factually or legally challenge Plaintiff Box's account of the circumstances leading to his arrest. (Hr'g Tr. 15:20–16:2.)

specificity, mandating that any granting order "shall be specific in terms" and "shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." Fed. R. Civ. P. 65(d). All federal courts therefore have a corresponding duty to ensure any grant of injunctive relief complies with the Rule's provisions. *See Schmidt v. Lessard*, 414 U.S. 473, 476–77 (1974) (per curiam) (noting district court's "comprehensive opinion" that concluded with the statement that the plaintiffs were "entitled to . . . injunctive relief against future enforcement of the present [state] scheme against them," but nonetheless vacating district court's subsequent judgment because "[n]either the brief judgment order nor the accompanying opinion is 'specific' in outlining the 'terms' of the injunctive relief granted; nor can it be said that the order describes 'in reasonable detail . . . the act or acts sought to be restrained'"); *Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 632 (7th Cir. 2003) (*sua sponte* considering injunction's compliance with Rule 65 due to "independent duty" to do so).

In the present case, there is no question that the plain language of Plaintiffs' TRO request seeks only to tell law enforcement to follow the law, a fact which Plaintiffs themselves admit. (TRO Appl. 13 (noting that granting request would merely "order[] Defendants to comply with the law").) And Plaintiffs have not shown, for example, that law enforcement has a specific blanket policy of erroneously enforcing California Penal Code section 602. (*See* TRO Reply 8 (quoting Officer Bates's declaration that protestors were warned <u>after allegedly committing multiple acts of violence</u> that they were trespassing on the property and if they refused to leave, they would be arrested); Davis Decl. ¶¶ 3–4 (sharply contesting Plaintiff Feinstein's account of police telling him he had to leave due to trespassing and alleging "[a]t no time did I, [police chief Davis,] speak with Michael Feinstein or tell him or anyone else that they would be arrested if they did not leave the site"). *Compare* TRO Appl. 11 (arguing that "Plaintiff Feinstein was arrested for nothing more than returning to the vigil site"), *with* Feinstein Decl. ¶¶ 1–12 (offering no proof of Plaintiff Feinstein's alleged arrest, and instead only noting that "[o]n October 17, 2016, [Plaintiff Feinstein] watched as the El Cajon Police Department arrested two people who

were near the vigil site," likely "Carl Box and Jean Vilsaint").)[10]  This leaves the Court unable to grant Plaintiffs' request with sufficient specificity and detail to comply with Rule 65.  *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 359 (1996) (concluding that the deprivation at issue was not "widespread enough to justify systemwide [injunctive] relief" and noting that "'[o]nly if there has been a systemwide impact may there be a systemwide remedy'" (quoting *Dayton Bd. Of Ed. v. Brinkman*, 433 U.S. 406, 417 (1977))); *City of L.A. v. Lyons*, 461 U.S. 95, 107 n.8 (1983) ("The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant."); *Daubenmire v. City of Columbus*, No. 2:04-CV-01105, 2008 WL 4758677, at *14 (S.D. Ohio Oct. 24, 2008) ("The Defendants appear to be seeking a blanket injunction enjoining the City from violating ceremonial burners' First Amendment rights. Such a blanket statement is cumulative of the rights already established in the First Amendment and is not needed.").  Accordingly, because Plaintiffs merely request that law enforcement follow the law, and because Plaintiffs have not shown a persistent pattern of law enforcement incorrectly applying California Penal Code section 602, the Court **DENIES** Plaintiffs' TRO request as lacking sufficient specificity and detail.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

---

[10] Plaintiffs also suggested at the Hearing that they "believe[d] Jean Vilsaint [had been arrested] as well, and there may have been others who were arrested for trespass . . . ." (Hr'g Tr. 5:5–13.)

## CONCLUSION

The Court recognizes that the circumstances underlying Plaintiffs' TRO request have provoked genuine concern on behalf of all those involved. However, the only question currently before the Court is the legal sufficiency on these facts of Plaintiffs' request for prospective relief.

Given the foregoing, Plaintiffs request for a temporary restraining order is **DENIED.**

**IT IS SO ORDERED.**

Dated: November 4, 2016

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge