**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ERIC BIDWELL, et al.,

                              Plaintiffs,

v.

COUNTY OF SAN DIEGO, et al.,

                              Defendants.

Case No.:  16cv2575-LL-MSB

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**
**[ECF Nos. 164, 166, 169, 177, 178]**

Plaintiffs allege they were unlawfully ordered to disperse, and that some were arrested without probable cause, after participating in protests, rallies, and vigils in response to a fatal police shooting. ECF No. 114 at 3. Defendants include the County of San Diego, Sheriff William D. Gore, fourteen deputy sheriffs[1] (collectively "the County Defendants" or "the County"), the City of El Cajon, Police Chief Jeff Davis, and six El Cajon police officers[2] (collectively "the El Cajon Defendants" or "the City").

---

[1] The fourteen deputies include (1) James Balderson, (2) Daniel Hubbard, (3) Matthew Gibson, (4) Elisha Hubbard, (5) Ericson Lamaster, (6) Eric Price, (7) Tyler Skeels, (8) Hank Turner, (9) Robert Smith, (10) Dustin Lopez, (11) Hank Turner, (12) Michael Rand, (13) Robert Smith, and (14) Dustin Lopez.

[2] The six officers include (1) Melisa Calderon, (2) Kenneth Davenport, (3) Greg Robertson, (4) Jason Sargent, (5) Eric Taylor, and (6) Michael Moulton.

-1-

The motions currently before the Court include: (1) a Motion for Summary Judgment by the El Cajon Defendants [ECF No. 164]; (2) a Motion for Summary Judgment by the County Defendants [ECF Nos. 166, 169[3]]; (3) a Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment by four of the sheriff's deputies[4] [ECF No. 169]; (4) an Opposition to the Defendants' Motions for Summary Judgment, and Cross Motion for Summary Judgment, by ten of the Plaintiffs (the "Wilson Plaintiffs")[5] [ECF No. 177]; and (5) a Cross-Motion for Summary Judgment, and Consolidated Oppositions to Defendants' Motions for Summary Judgment or Partial Summary Judgment, by four of the Plaintiffs ("the Bidwell Plaintiffs")[6] [ECF No. 178].[7]

The motions are submitted on the papers without the need for oral argument. *See* S.D. Cal. CivLR 7.1(d)(1); Fed. R. Civ. P. 78(b). For the below reasons, Defendants' Motions for Summary Judgment [ECF Nos. 164, 166, 169] are **GRANTED**. The Plaintiffs' Cross Motions for Summary Judgment [ECF Nos. 177, 178] are **DENIED**.

---

[3] Four specially appearing deputies—Turner, Rand, Smith, and Lopez—who initially claimed they were improperly served, filed a Motion for Summary Judgment joining the County's motion and the El Cajon Defendant's motion. *See* ECF Nos. 168, 169.

[4] The four deputies include Turner, Smith, Rand, and Lopez.

[5] The Wilson Plaintiffs include (1) Jamie Wilson and her three minor children, (2) Carl Box, (3) Levandis Carter, (4) Tegan Daniels, (5) Sean Farris, (6) Anthony Jimenez, (7) Andrew Paster, (8) Kristen Preston, (9) Jean Vilsaint, and (10) Ian Whitehouse. ECF No. 177 at 1.

[6] The Bidwell Plaintiffs include (1) Eric Bidwell, (2) Michael Feinstein, (3) Jeff Provenzano, and (4) Azikiwe Franklin.

[7] Neither side identifies any material portion of their fellow Plaintiffs' or Defendants' arguments they disagree with, nor is it apparent that there is any material divergence of interests within either group in deciding the instant motion. Therefore, for all practical purposes, each side's motions will generally be considered together even if the parties did not explicitly join or incorporate all portions of their fellow Plaintiffs' or Defendants' motions.

# I.   BACKGROUND

The parties do not dispute the following facts.[8] *See* ECF Nos. 178, 182. On September 27, 2016, Alfred Olango was shot by El Cajon police in the parking lot of Panchos Mexican Grill ("Panchos") located in the Broadway Village Shopping Center ("Broadway Village") in El Cajon. Broadway Center Associates, LLC owns Broadway Village. On the day of the shooting, protesters gathered at the scene. A vigil was set up in the parking lot next to where the shooting occurred. There was a popup tent, barbeques, candles, posters, and pictures of Mr. Olango. A series of protests, rallies, and vigils continued for weeks.

## A.   October 1st and 2nd

On the evening of October 1, 2016, the crowd grew from approximately 30 people at 7:00 p.m. to 200 people by 10:45 p.m. At approximately 11:45 p.m., around 130 people remained in the parking lot area. An El Cajon Police Department (ECPD) detective working in an undercover capacity reported to the incident command that violence erupted within the crowd and there was a threat that someone was going to go get a gun. A sheriff's deputy, Morgan Webb, who was working in plain clothes, was in the parking lot. Webb saw a group of approximately four to six adult males approach his location and one of them appeared to get angry, take his shirt off and state "I'm going to go get my gun." The male approached a vehicle, and then the others pushed him towards a storefront. Webb put out on the air that there was a "415,"[9] and that a black male adult took off his shirt and said he

---

[8] The El Cajon Defendants filed a separate and itemized statement of undisputed facts. ECF No. 164-2. The Bidwell Plaintiffs provided an itemized response to each fact [ECF No. 182], but the Wilson Plaintiffs did not. The El Cajon Defendants therefore argue those facts should be considered undisputed by the Wilson Plaintiffs under Rule 56(e)(2). ECF No. 183 at 6. Given the common interests of both groups of Plaintiffs, and the competing statements of facts provided in the Wilson Plaintiffs' filings, it cannot reasonably be said the Wilson Plaintiffs failed to dispute any of Defendants' facts by virtue of the fact the Wilson Plaintiffs did not file an itemized response.

[9] Under California Penal Code section 415(1), it is a misdemeanor to "unlawfully fight[ ] in a public place or challenge[ ] another person in a public place to fight."

was going to get his gun. Police in the command post did not know if those involved were still there, whether they left, or whether they went into the crowd because police could not locate them. A decision to declare the assembly unlawful was made by the officers in the incident command post.

The incident command post was located in the ECPD and was a joint command with the Sheriff's Department. The command post had a computer-aided dispatch laptop, a laptop for the intelligence officer, and two televisions—one that monitored news stations and another that monitored live video feed from helicopters. At some point, undercover officers from the ECPD and the Sheriff's Department were in the crowds to monitor the protesters and provide intelligence back to the command post. Police also used confidential informants positioned within the crowds to report any potential threats.

Robert Smith, a lieutenant with the Sheriff's Department, was given orders to enforce the unlawful assembly order. Smith observed a group of 30 to 40 people still present at the vigil site when he arrived. A person claiming to be a spokesperson for the group, believed to be Bidwell, approached and Smith explained that an unlawful assembly had been declared and the group needed to go. Smith determined that although the altercation was no longer going on, he was aware that someone involved in the incident stated he was going to go get a gun. Most of the protesters followed the order to disperse, however, a "small group" of protesters refused to disperse even after being given time to leave pursuant to the order. A "fair amount" of people left after the dispersal announcement was made via helicopter, but there was a "relatively small" group of people that were "pretty adamant" they did not want to leave. Over the course of an hour, the group decreased to 20 people or so. Representatives of the protesters were talking to law enforcement and returned to the group and said officers wanted them to leave. All Plaintiffs who were present heard the unlawful assembly order. Bidwell heard the unlawful assembly declaration and order to disperse being made every 5 to 10 minutes for an hour. Plaintiffs who remained at the scene were arrested in the early morning hours of October 2, 2016. From October 2, 2016 through October 14, 2016 there were daily gatherings, but there was

no enforcement action taken because the gatherings did not become violent or pose an imminent danger of violence. On the evening of October 15, 2016, a group of protesters blocked an intersection. The protesters were given an order to disperse and were warned they were trespassing and if they refused to leave, they would be arrested. The protesters dispersed and no arrests were made.

### B.     October 16th and 17th

On October 16, 2016, the owner of the property came to the site and hired a security company to monitor the property. The candles, other items, and trash left at the vigil site in the parking lot were removed. The property owner expressed that he did not want protesters on his property. Chief Davis met with Thomas Abbate, the "managing member" of the property, who informed him that the unauthorized occupation of the private parking lot became an increasing burden due to loss of business by tenants in the shopping center. Incident command officers were informed the owner did not desire protestors on that site. The Broadway Village owners contacted the ECPD and requested assistance with removal of anybody that was on their property without legitimate business to their stores or restaurants. Protesters were asked to leave the property and some Plaintiffs were arrested.

On October 17, 2016, Broadway Village entered into a contract with a private security company, and a security guard was assigned to patrol Broadway Village that day. The security guard was instructed to ask people who were not doing business within a company on the premises to leave, and if they did not leave, he was instructed to call the police. Protestors were asked to leave the property.

Plaintiffs Box and Vilsaint had purchased food or a drink at Broadway Village. The security guard told them they were on private property and needed to leave, but they refused. The security guard called the ECPD, and when officers arrived, they told Box and Vilsaint they were trespassing and to leave the area. When Box and Vilsaint refused, they were arrested. At some other point, Carter and Franklin were also standing in the area, either on public or private property. Officers informed them they were trespassing, but they refused to leave the area. When officers went to arrest them, Carter and Franklin ran, and

the officers apprehended them.[10]

## C. Procedural Background

On October 16, 2016, the initial complaint was filed. After multiple motions to dismiss and amended complaints, the Fifth Amendment Complaint ("FAC"), which is the operative complaint, was filed on August 5, 2019. ECF No. 114. Plaintiffs bring claims under 42 U.S.C.§ 1983 and state law arising from the unlawful assembly declarations and subsequent arrests. Plaintiffs also bring one claim for false imprisonment. On September 25, 2020, the case was transferred to Judge Robinson. ECF No. 188. The motions were fully briefed, including a notice of supplemental authority, on October 22, 2020. ECF No. ECF No 90. A hearing on the motions was set for February 2, 2022. ECF No. 205. On January 4, 2022, the case was transferred to the below-signed district judge. ECF No. 206. The hearing was subsequently vacated and the motions deemed suitable for submission on the papers without oral argument. *See* ECF No. 208.

## II. LEGAL STANDARD

Where a moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," the court must grant summary judgment. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it could affect the outcome of the case under governing law.

---

[10] The Bidwell Plaintiffs submitted: (1) sixty pages of objections to Defendants' Statement of Material Undisputed Facts and the evidence submitted in support thereof [ECF No. 182]; (2) twelve pages of evidentiary objections to the City's Evidence [ECF No. 194]; and (3) five pages of objections to the County's evidence [ECF No. 193]. The El Cajon Defendants also submitted various evidentiary objections to Plaintiffs' evidence. *See* ECF No. 183-1. Finally, the Wilson Plaintiffs argue that "[m]uch of Defendants' alleged evidence lacks foundation or is inadmissible hearsay" but did not make any specific objections to any specific pieces of evidence. ECF No. 189 at 5:13-14. These objections are mostly, if not entirely, boilerplate and unspecific. To the extent the challenged evidence is used to support the Court's order, the objections [*see* ECF Nos. 32, 37, 38, 44] are **OVERRULED** because the evidence could be presented in admissible form at trial. *See Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003); *see also Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006). To the extent the evidence is not referenced in the Court's order, the objections are **OVERRULED** as moot.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine if the evidence, viewed in the light most favorable to the non-moving party, "is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

The moving party may make this showing by identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If a moving party carries its burden of showing the absence of evidence as to an essential element of the opposing party's case, "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010); *see also Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009). "This burden is not a light one." *Oracle*, 627 F.3d at 387. The party opposing the motion for summary judgment "must show more than the mere existence of a scintilla of evidence" by coming forward "with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* It can do this by citing to specific parts of the materials in the record or by showing that the materials cited by the moving party do not compel a judgment in the moving party's favor. Fed. R. Civ. P. 56(c).

"In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence," *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007), and will draw inferences from the facts in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the non-moving party's mere allegation that factual disputes exist between the parties will not defeat an otherwise properly supported motion seeking summary judgment. *See* Fed. R. Civ. P. 56(c); *see also Soremekun*, 509 F.3d at 984 ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment"); *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir.1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment"). Further, if the factual context makes the non-moving party's claim as to the existence of a material issue of fact

-7-

implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Matsushita*, 475 U.S. at 587. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Videos should be "in the light depicted by the videotape." *Id.* at 380-81.

## III.   DISCUSSION

In support of their claims against individual sheriff's deputies and police officers ("the police" or "the officers") under 42 U.S.C. § 1983, Plaintiffs argue their First and Fourth Amendment rights were violated as a result of: (1) the unlawful assembly declaration and dispersal order late in the evening on October 1, 2016; (2) the subsequent arrest of some Plaintiffs in the early morning hours of October 2, 2016; and (3) the arrest of some Plaintiffs on October 17, 2016.

Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute . . . of any State . . . subjects . . . any citizen . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law." The statute "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979)). To state a claim under § 1983, a plaintiff must establish: (1) she was deprived of a right secured by the Constitution, and (2) the alleged deprivation was committed under color of state law. *Azer v. Connell*, 306 F.3d 930, 935 (9th Cir. 2002). Here, there is no dispute the police were acting under the color of state law.

Defendants argue that no constitutional rights were violated, and even if so, they are entitled to qualified immunity. ECF Nos. 164 at 2; 166 at 3. "Qualified immunity protects government officials from liability for civil damages unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Horton v. City of Santa Maria*, 915 F.3d 592, 599 (9th Cir. 2019) (citing *Harlow*

*v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In cases where the defense of qualified immunity is raised, the plaintiff must show that "(1) the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "These inquiries are questions of law." *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018) (citation omitted). "The judges of the district courts and the courts of appeals [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation omitted). The inquiry requires courts to determine if "the violative nature of particular conduct is clearly established," *id.* at 742, and therefore "must be undertaken in light of the specific context of the case, not as a broad general proposition," *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "Clearly established law" does not require "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. "Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert these deputies in this case that their particular conduct was unlawful. To achieve that kind of notice, the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (citing *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

///
///
///
///
///

### A.    Unlawful Assembly Declaration

All Plaintiffs allege their First Amendment rights were violated in the late evening hours of October 1, 2016, or in the early morning hours of October 2, 2016,[11] because "despite no credible evidence of an imminent threat of violence from the vigil attendees, [Defendants] declared the assembly to be unlawful." FAC at 23 ¶ 78. Plaintiffs allege "[t]he dispersal order was solely due to the inconvenience to police officers monitoring a peaceful vigil at midnight." *Id.* ¶ 80. Plaintiffs bring their First Amendment claim against Sheriff Gore and fourteen of the named deputies, as well as Chief Davis and two ECPD officers.

Defendants argue they are entitled to qualified immunity with respect to the unlawful assembly declaration because Plaintiffs cannot identify any clearly established law that it would be a violation of Plaintiffs' constitutional rights to declare an unlawful assembly based on the particularized facts of this case. ECF Nos. 164-1 at 37; 166-1 at 33. The County Defendants argue the unlawful assembly declaration and dispersal order were lawful under section 407 of the California Penal Code because:

> [B]ased on the information they received, the elements of § 407 were present: two or more persons assembled together had engaged in a violent, boisterous or tumultuous act (yelling and pushing a man away from a car and up against a storefront window to prevent him from getting to the car where he may have had a gun). Additionally, a clear and present danger of imminent violence existed in the parking lot due to that fight and the man threating [sic] to get a gun.

ECF No. 166-1 at 19. In response, Plaintiffs argue, *inter alia*, that: (1) Defendants may not declare an unlawful assembly "whenever anyone anywhere says or does anything that can be construed as violent or unlawful" [ECF No. 177 at 3]; (2) "[i]f there is no widespread violence or imminent threat of widespread violence, there is no unlawful assembly" [*id.* at 25]; and (3) "[b]y Defendants' logic, anytime anyone wanted to shut down a peaceful assembly of dozens, hundreds, or even thousands of people, they could easily do so simply

---

[11] The parties dispute whether the unlawful assembly declaration was made before midnight on October 1, 2016, or at midnight on October 2, 2016.

by going there and saying the magic words, 'I'm going to go get a gun'" [*id.* at 29].

Under California Penal Code section 407, an unlawful assembly occurs "[w]henever two or more persons assemble together to do an unlawful act, or do a lawful act in a violent, boisterous, or tumultuous manner." Under California Penal Code section 726, "[w]here any number of persons, whether armed or not, are unlawfully or riotously assembled, the [county or city officials] must go among the persons assembled, or as near to them as possible, and command them . . . immediately to disperse." In *Collins v. Jordan*, 110 F.3d 1363 (9th Cir. 1996), the Ninth Circuit noted "it is clearly established federal and state law that protests or assemblies cannot be dispersed on the ground that they are unlawful unless they 'are violent or . . . pose a clear and present danger of imminent violence,' or they are violating some other law in the process." *Id*. at 1371 (citations omitted).

The Bidwell Plaintiffs argue the officers who made the decision to declare the unlawful assembly,[12] and the deputy who enforced the dispersal order,[13] are not entitled to qualified immunity because, under *Collins*, "Plaintiffs' right not to be dispersed or arrested absent clear evidence that the assembly was violent or [there was an] imminent threat of violence is clearly established."[14] ECF No. 178-1 at 40. The ultimate holding of *Collins*, however, was that "the occurrence of limited violence and disorder on one day is not a justification for banning all demonstrations, peaceful and otherwise, on the immediately following day." 110 F.3d at 1372. The case involved a decision by the mayor and chief of police to ban all demonstrations city-wide for the following day, whether they were

---

[12] The parties do not dispute that Captain Moulton and Lieutenant Taylor, of the ECPD, and Captain Turner, of the Sheriff's Department, were in the incident command post where the decision was made to declare the assembly unlawful. *See* ECF No. 182 at 26 ¶¶ 78, 80. However, the parties dispute whether Lieutenant Taylor made the decision by himself, or whether it was a joint decision.

[13] The parties do not dispute that Lieutenant Smith, of the Sheriff's Department, was in charge of enforcing the unlawful assembly order.

[14] Other than a passing citation to *Collins*, the Wilson Plaintiffs do not attempt to cite clearly established law with respect to the unlawful assembly declaration. ECF No. 177 at 26.

peaceful or not, based on violence that occurred in parts of the city earlier in the day. *Id*. at 1367. That is not the situation here. Accordingly, while *Collins* may clearly establish that assemblies must be violent or pose a threat of imminent violence to be unlawful, it is not particularized to the facts of this case.[15] *See White v. Pauly*, 137 S. Ct. 548, 552 (2017) ("[T]he clearly established law must be 'particularized' to the facts of the case.") (citation omitted).

Here, the parties do not dispute the assembly was centered around the Los Panchos parking lot and consisted of about 130 people. Moreover, the parties do not dispute that at around 11:45 p.m. an agitated man in the Panchos parking lot took off his shirt, yelled that he was going to get his gun, and then was restrained by several other people as he apparently attempted to get to a vehicle. As described by the Bidwell Plaintiffs, the police were aware that an adult shirtless male, who was "upset and agitated about something," yelled "I am going to get my gun" and "head[ed] towards a car, and four to six other members [were] yelling 'whoa, whoa, whoa,' while pushing the [man] away from a car." ECF No. 178-1 at 29, 30. There is also no dispute that police responded to the scene, but did not locate the man or otherwise confirm the threat of gun violence was no longer present.[16] As stated in the list of undisputed facts, "those in the command post did not know if those involved were still there, whether they left, or whether they went into the crowd because police could not locate them." ECF No. 182 at 29 ¶ 86. Within approximately fifteen minutes, the decision to declare the assembly unlawful was made by the officers in

---

[15] The Bidwell Plaintiffs also cite *Jones v. Parmley*, 465 F.3d 46, 52 (2d Cir. 2006), a non-controlling case which found that briefly entering a highway to distribute literature by a few protestors, thereby causing traffic to slow down, was not a justification for violently disbanding the entire protest. Again, however, in *Jones*, there was no indication of any form of violence. *See id.* at 53 ("They allege [the demonstrators] made no threats, engaged in no violent behavior, displayed no weapons and made no effort to move toward the line of troopers."). *Jones* ultimately held that a few peaceful protesters entering a highway is not a danger warranting immunity for forcefully disbanding the entire protest. *Id*. at 54.

[16] The County Defendants state that upon hearing the threat, all plain-clothed deputies were ordered out of the area because of the threat. ECF No. 166-1 at 18.

the incident command post. Based on the above, at least some form of actual violence and a threat of violence occurred in or around the area of the assembly.[17]

Certainly, there is room for debate as to whether a man who threatens to get a gun, who is then restrained by several other people, all of whom are in or around the area of a demonstration, constitutes "two or more persons assemble[d] together to do an unlawful act, or a do a lawful act in a violent, boisterous, or tumultuous manner." *See* Cal. Penal Code § 407. There is also room for debate as to whether it was necessary for police to declare the entire assembly unlawful based on one incident involving a few individuals given that the other people in the assembly, including Plaintiffs, were otherwise peaceful and apparently sought to control the threat of violence. Some courts, including *Collins*, have suggested the First Amendment does not support unlawful assembly declarations based on violence, or a threat of violence, which occur amongst a few individuals in or around an otherwise peaceful assembly. *See Collins*, 110 F.3d 1372 ("The courts have held that the proper response to potential and actual violence is for the government to ensure an adequate police presence, and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure."); *see also Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 834 (9th Cir. 2020) ("The many peaceful protesters, journalists, and members of the general public cannot be punished for the violent acts of others."); *Parmley*, 465 F.3d at 57 (reasoning that police should be "prevent[ed] . . . from ending a demonstration without notice for the slightest transgression by a single protester (or even a mere rabble rouser, wholly unconnected to the lawful

---

[17] The Wilson Plaintiffs argue that "[i]t is not a crime to transport a firearm in a locked container in California" and "[t]he individual in question did not say why he was going to 'go get my gun,' what he was going to do with his gun, or that he would transport it in an unlawful manner or for any unlawful purpose." ECF No. 177 at 19-20. The fact that he did not say what he was going to do with his gun adds to the threat of violence more than it diminishes it, especially from the perspective of police. Moreover, given the context, it is not rational to infer that the agitated shirtless man who said he was going to get his gun was threatening to bring his gun to the assembly in a locked container for peaceful purposes.

protest)"). As discussed below, courts have also found that not all protesters must commit violence before they can be lawfully arrested for failing to disperse. *See*, *e.g.*, *People v. Cipriani*, 18 Cal. App. 3d 299 (1971).

However, for the purpose of deciding whether officers are entitled to qualified immunity, all that is required is a lack of clearly established law that would put them on notice that certain conduct violates constitutional rights. *Horton*, 915 F.3d at 599. Here, the case law is not so clear that a reasonable officer would know that he would violate Plaintiffs' First Amendment rights to declare an unlawful assembly under section 407 based on: (1) a clear threat of gun violence, and an apparent attempt to retrieve a gun, by an agitated individual in or around the area of a demonstration of this particular size and geographical scope; (2) some form of physical altercation between two or more persons as several people restrained one of them; and (3) the apparent lack of knowledge by police as to the man's whereabouts following the altercation.[18] "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231. While Plaintiffs argue that assemblies cannot be unlawful unless violence is "widespread," there is no such requirement under § 407, which refers to as few as "two

---

[18] The few cases challenging the lawfulness of an order to disperse under section 407 in a § 1983 claim involved non-violent protesters that blocked public access points, or where there was no dispute the assembly was violent. *See Dubner v. City & County of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001) (protestors and observers alleged to have blocked access to convention center); *Cavanagh v. Humboldt County*, No. C 97-4190 CRB, 1999 WL 96017, at *4 (N.D. Cal. Feb. 22, 1999) (protestors blocking roads in violation of county statute was sufficient grounds to declare an unlawful assembly), *aff'd*, 1 F. App'x 686 (9th Cir. 2001); *Cervantes v. Zimmerman*, No. 17-cv-01230-BAS-AHG, 2020 WL 5759752, at *2 (S.D. Cal. Sept. 28, 2020) (noting there was no dispute between the parties that "escalating violence" was a sufficient basis for declaring an assembly to be unlawful), *aff'd sub nom. Ramirez v. Zimmerman*, No. 20-56117, 2021 WL 5104371 (9th Cir. Nov. 3, 2021); *Hicks v. City of Portland*, No. CV 04-825-AS, 2006 WL 3311552, at *2 (D. Or. Nov. 8, 2006) (protestors blocked streets).

or more persons."[19] *See Cervantes*, 2020 WL 5759752, at *8 (finding that it was a misstatement of law for plaintiffs to argue that the only lawful basis for declaring an assembly unlawful is "widespread" violence or "widespread" threat of violence).[20] Based on the above, Plaintiffs have not met their burden of showing that Defendants violated a constitutional right that was clearly established at the time of the unlawful assembly declaration.[21] Defendants are entitled to qualified immunity as to the unlawful assembly declaration.[22] Additionally, in light of the circumstances in the particular case at hand, it is not necessary to reach the issue of whether Plaintiffs' First Amendment rights were

---

[19] The Bidwell Plaintiffs similarly argue that "[t]he emphasis is on group violence, not individual violence." ECF No. 178-1 at 28.

[20] To the extent the Bidwell Plaintiffs continue to object to the Court relying on *Cervantes*, 2020 WL 5759752 [*see* ECF No. 196 at 2], the objections are **OVERRULED** because the Bidwell Plaintiffs had the opportunity to respond to Defendants' notice of supplemental authority, [*see* ECF No. 197 at 2].

[21] Plaintiffs also argue that police used the incident as a pretext for declaring the entire assembly unlawful as demonstrated by the fact that: (1) immediately after the man threatened to get a gun and was restrained, an officer reported to the scene, but left the area after talking with citizens, and the man who made the threat was not located; (2) the assembly was not declared to be unlawful until about fifteen minutes after the incident; (3) officers did not arrive on the scene to enforce the unlawful assembly order until about forty-five minutes after the threat; and (4) officers at the scene of the dispersal were not informed about the man who said he was going to get his gun. ECF No. 178-1 at 13-14; ECF No. 166-1 at 28. Plaintiffs do not, however, argue or demonstrate that evidence of pretext requires a subjective, rather than objective, view of the totality of circumstances. *Gordon v. County of Orange*, 6 F.4th 961, 968 (9th Cir. 2021) (find that the district court erred in analyzing the clearly established prong by incorporating a subjective standard).

[22] The Bidwell Plaintiffs argue that "[t]his Court has already found that the Plaintiffs have established a clearly established First Amendment right under the facts of this case." ECF No. 178-1 at 40-41 (citing ECF No. 66 at 19:8-19). This argument is unavailing because Judge Sammartino merely found, in the context of deciding a motion to dismiss in which she was required to assume the protests were "peaceful at all times," that it was *plausible* qualified immunity could be overcome.

-15-

violated as a result of the unlawful assembly declaration.[23] *See Pearson*, 555 U.S. at 236.

## B. October 2nd Arrests

Nine of the Plaintiffs[24] allege that in the early morning hours of October 2, 2016 they were arrested without probable cause. FAC at 25-26 ¶¶ 89-99. In a separate claim, Plaintiff Wilson alleges she was arrested without probable cause in front of her children, but was released after "coerc[ing] her into agreeing to immediately leave the peaceful vigil and take her children home." *Id.* ¶¶ 111. Plaintiffs bring these claims against Sheriff Gore and all fourteen of the named deputies, as well as Chief Davis and two ECPD officers. *Id.* at 24. Plaintiff Wilson brings her claim against Sheriff Gore and four of the named deputies, as well as Chief Davis and two ECPD officers.[25] *Id.* at 28.

"An arrest must be supported by probable cause to believe that the person being arrested has committed a crime." *Hernandez v. Skinner*, 969 F.3d 930, 938 (9th Cir. 2020) (citation omitted). "Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." *Dubner*, 266 F.3d at

---

[23] The El Cajon Defendants argue that no First Amendment violation occurred because "Broadway Village is private property to which the First Amendment does not apply." ECF No. 164-1 at 32. The El Cajon Defendants also argue that no First Amendment violation occurred because "[e]ven if the First Amendment applied in this privately owned parking lot, there is no evidence that the plaintiffs' political speech was a substantial or motivating factor in any law enforcement officers' decision to declare the assembly unlawful." *Id.* at 33. The County Defendants also argue that "Plaintiffs must present sufficient evidence against each of the individual County Defendants" because "[u]nder section 1983 jurisprudence, there is no vicarious or group liability." ECF No. 166-1 at 22. Because both the El Cajon and County Defendants are entitled to summary judgment based on qualified immunity, the Court does not reach these arguments.

[24] The nine Plaintiffs include (1) Bidwell, (2) Burney, (3) Carter, (4) Farris, (5) Feinstein, (6) Preston, (7) Provenzano, (8) Vilsaint, and (9) Whitehouse.

[25] The El Cajon Defendants argue "it is undisputed that none of the El Cajon defendants personally participated in the arrests for failure to disperse on October 2, 2016." ECF No. 164 at 42.

966 (citing *United States v. Garza*, 980 F.2d 546, 550 (9th Cir. 1992)). "A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). "Probable cause may exist for an arrest for a closely related offense, even if that offense was not invoked by the arresting officer, as long as it involves the same conduct for which the suspect was arrested." *Blankenhorn v. City of Orange*, 485 F.3d 463, 473 (9th Cir. 2007) (internal quotation marks and citation omitted).

Defendants argue there was probable cause for the arrests under California Penal Code section 409 which provides that "[e]very person remaining present at the place of any riot, rout, or unlawful assembly, after the same has been lawfully warned to disperse, except public officers and persons assisting them in attempting to disperse the same, is guilty of a misdemeanor." ECF No. 164-1 at 39; *see also* ECF No. 166-1 at 24. Under section 409, a person's mere "presence" after the declaration of an unlawful assembly and dispersal order, without any additional action on their part, constitutes a violation of section 409. *Cipriani*, 18 Cal. App. 3d at 309. "The plain objective of section 409 is to enable law enforcement officers to de-fuse riotous situations by ordering persons to remove themselves from the area without any need to distinguish between the rioters and bystanders whose very presence aggravates the problem of restoring tranquility." *Id.*; *see also Dubner*, 266 F.3d at 968 (finding that "police are at least required to differentiate between the participants and innocent bystanders" absent violence or a threat of imminent violence); *In re Wagner*, 119 Cal. App. at 103 (reasoning that "[n]ot every member of the assembly must individually commit unlawful acts to render the assembly unlawful").

"The doctrine of qualified immunity," however, "does not require that probable cause to arrest exist. Even absent probable cause, qualified immunity is available if a reasonable police officer could have believed that his or her conduct was lawful, in light of clearly established law and the information the . . . officers possessed." *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1443 (9th Cir. 1991) (citing *Anderson v. Creighton*, 483 U.S. 635,

641 (1987)). "Thus, even if the officers were mistaken that probable cause to arrest . . . existed, they are nonetheless immune from liability if their mistake was reasonable." *Id.*

The County Defendants argue they are entitled to qualified immunity for the arrests that were made in the early morning hours of October 2, 2016 because, even assuming the dispersal order was illegal:

> it was not clearly established, beyond debate, that a deputy violates the Constitution by enforcing an illegal dispersal order when . . . the deputy was not on the scene when the unlawful assembly declaration was made, did not know the basis for that declaration, and had no reason to doubt the declaration was lawful.

ECF No. 166-1 at 26.[26]

As noted above, the Bidwell Plaintiffs argue that Lieutenant Smith is not entitled to qualified immunity because, under *Collins*, their right not to be arrested absent evidence that the assembly was violent or there was an imminent threat of violence is clearly established.[27] ECF No. 178-1 at 40. As discussed above, while *Collins* may clearly establish that assemblies must be violent or pose a threat of imminent violence to be unlawful, it is not particularized to the facts of this case. Plaintiffs cite no case addressing whether arresting officers, who did not issue an order to disperse, and who did not know the basis for the order to disperse, are entitled to qualified immunity against § 1983 claims arising from the arrests of those who refused to disperse if the underlying order was unlawful.

---

[26] The County Defendants also argue the deputies have qualified immunity when "the deputy had a statutory obligation to enforce the order" and "the deputy did not work for the law enforcement agency that issued the order." ECF No. 166-1 at 26. With respect to Wilson, the El Cajon Defendants argue she was not arrested, but was momentarily detained. ECF No. 164-1 at 41. Even if she was arrested, however, the arresting officer would still be entitled to qualified immunity. Given the Court's ruling, it is not necessary to reach these arguments.

[27] The Wilson Plaintiffs merely argue that "every case dealing with false arrest is directly on point" and "when there is no probable cause for an arrest, officers cannot make an arrest." ECF No. 177 at 26.

Instead, Plaintiffs argue that "an arrest under Penal Code section 409 must be predicated on a valid declaration of unlawful assembly under Penal Code 407." ECF No. 190. While it may be that a conviction for disobeying a lawful order to disperse cannot stand when the underlying order to disperse is unlawful, the inquiry here is not whether the suspect actually committed the offense, but whether a reasonable officer had probable cause to think that the suspect could have committed the offense. *See Fidge v. Lake Cnty. Sheriff's Dep't*, No. 13-cv-05182-YGR, 2015 WL 3919819, at *6 (N.D. Cal. June 25, 2015), *aff'd*, 683 F. App'x 605 (9th Cir. 2017).

As discussed above, there is no genuine dispute the assembly was not completely peaceful. While it may be that the level or nature of the violence that occurred was insufficient to declare the assembly unlawful under section 407, Plaintiffs do not identify any case clearly establishing it was insufficient. It cannot be genuinely disputed that the arresting deputies knew, as did everyone who was present in the area, that an order to disperse had been given, and that the arrested Plaintiffs refused. "Probable cause must exist from facts and circumstances known to the officers at the moment of arrest." *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1298 (9th Cir. 1988). Plaintiffs cite no case showing that it is clearly established law the individual arresting officers were required to make an "individualized inquiry" as to whether the underlying dispersal order was lawful before arresting persons for refusing that order. *See Cervantes*, 2020 WL 5759752, at *17 (applying qualified immunity in a case of first impression challenging the scope of a dispersal order under section 407 and rejecting the argument that deputies must make an "individualized inquiry" as to whether each member of a crowd had a reasonable opportunity to disperse). Plaintiffs also cite no case instructing arresting officers, who did not make the unlawful assembly declaration, where to draw the line in deciding for themselves that arresting those who are not violent, but who refuse to disperse, is no longer necessary in order to "restore tranquility." *Cipriani*, 18 Cal. App. 3d at 309.

Finally, the Bidwell Plaintiffs argue that "[i]f police officers can rely on the imputed knowledge of other officers to establish probable cause, then certainly knowledge that

demonstrates that there is no probable cause must likewise be imputed to the officers." ECF No. 178-1 at 46. The Bidwell Plaintiffs argue that "[i]n this case, the facts that one shirtless black male yelled that he was going to get his gun, while four-to-six other males pushed him back yelling 'whoa, whoa, whoa' should be imputed on the arresting deputies." *Id.*; *see also* ECF No. 177 at 24 ("Defendants were just collectively wrong about the law."). This argument presumes, however, that these facts show the absence of grounds for the unlawful assembly order. As discussed above, these facts support, at least to some degree, the lawfulness of the dispersal order under section 407. Accordingly, to the extent the collective knowledge doctrine applies here, these facts serve to support probable cause for the arrests under section 409 because each of the arresting officers would be presumed to have known, prior to making their arrest, that at least some level of violence or threat of violence occurred at the assembly, and therefore some grounds existed for the dispersal order that Plaintiffs did not follow.

Based on the above, Plaintiffs have not met their burden of showing that Defendants violated a constitutional right that was clearly established at the time of the October 2, 2016 arrests. Accordingly, Defendants are entitled to qualified immunity as to the October 2, 2016 arrests.[28]

### C.   October 17th Arrests

Plaintiffs Box, Vilsaint, Carter, and Franklin allege that on October 17, 2016 they were arrested by El Cajon officers without probable cause for trespassing at the vigil site in the Panchos parking lot. FAC at 30 ¶¶ 122-44. Carter was also arrested for resisting arrest under California Penal Code section 148(a). ECF No. 161-1 at 43. Plaintiffs bring these claims against Chief Davis and four ECPD officers.[29] FAC at 30.

The El Cajon Defendants argue that probable cause for the arrests existed because

---

[28] Again, in light of the circumstances in the particular case at hand, it is not necessary reach the issue of whether Plaintiffs' First and Fourth Amendment rights were violated as a result of the arrests. *See Pearson*, 555 U.S. at 236.

[29] The four ECPD officers are Calderon, Davenport, Robertson, and Sargent. FAC at 30.

all four Plaintiffs "refus[ed] to leave the private parking lot of Broadway Village after being told to do so by the security guard and police officers." ECF No. 164-1 at 43. Under California Penal Code section 602(o), it is a misdemeanor to "[r]efus[e] or fail [to] leave land, real property, or structures belonging to or lawfully occupied by another and not open to the general public, upon being requested to leave by (1) a peace officer at the request of the owner or (2) the owner, the owner's agent, or the person in lawful possession."[30]

"The California legislature has not explicitly defined what it means for a property to be 'open to the general public' under § 602(o)." *Garcia v. City of Santa Clara*, No. 10-cv-02424-SI, 2016 WL 7212192, at *3 (N.D. Cal. Dec. 13, 2016). In *Blankenhorn*, the court held that "a shopping center, under California law, is generally 'open to the public.'" 485 F.3d at 474. However, the court held that probable cause existed to arrest the plaintiff, a suspected gang member, for trespassing at a mall because he was previously issued a written notice by a security guard informing him that if he returned he would be prosecuted for trespassing. *Id.* The court reasoned that the notice "arguably rendered [the mall] 'not open to the public' with respect to [the plaintiff]." *Id.*; *see also Rosenbaum v. Washoe County*, 663 F.3d 1071, 1076 (9th Cir. 2011) (per curiam) ("An officer is entitled to qualified immunity if 'it is reasonably arguable that there was probable cause for arrest.'") (citation omitted).

The El Cajon Defendants argue that under *Blankenhorn* "[a] reasonable officer could conclude based upon the facts known that the conduct satisfied the elements of trespass under section 602(o)" because "Broadway Village was similarly not open to the public with respect to these four plaintiffs after they were undisputedly asked to leave by both the

---

[30] The statute also provides that it "shall not apply to persons on the premises who are engaging in activities protected by the California or United States Constitution, or to persons who are on the premises at the request of a resident or management and who are not loitering or otherwise suspected of violating or actually violating any law or ordinance." Cal. Penal Code § 602(o). In their Oppositions and Motions, however, Plaintiffs do not argue that this exception applies to them. Plaintiffs argue that at the time of their arrests they had permission to be on the premises because they were there as customers.

owner's agent and police officers prior to their arrests." ECF No. 164-1 at 46. Since *Blankenhorn*, other courts have found that a place typically "open to the general public" can become "arguably not open to the public" as to particular individuals when they are issued a ban notice. *See, e.g.*, *Bashkin v. San Diego County*, No. 08cv1450-WQH-WVG, 2010 WL 2010853, at *6 (S.D. Cal. May 20, 2010) (finding that although a casino may be generally open to the public, a ban letter arguably rendered the casino not open to the public with respect to the plaintiff).

In response, the Wilson Plaintiffs cite a pretrial order in which the district judge found the "tortured" interpretation of what qualifies as a space "not open to the general public" in *Blankenhorn* may not be an appropriate issue to be raised at the trial pending before that judge. *See Han v. City of Los Angeles*, No. 2-14-cv-08582-DDP-JPR, 2016 U.S. Dist. LEXIS 170154, at *15 (C.D. Cal. Dec. 5, 2016). In addition to being non-controlling, the judge went on to note that the issue in *Blankenhorn* was not whether the plaintiff was trespassing, but whether a reasonable officer had probable cause to think he could have been. *Id*. The court stated, "this emphasis on how a reasonable officer might interpret the law is more appropriate for deciding the qualified immunity issue than determining whether the officer had probable cause to arrest in the first instance." *Id.* at *16.

Here, Plaintiffs were not given a written ban notice, and Plaintiffs argue they were previously told they could be on the premises as long as they were there as customers.[31] However, Plaintiffs cite no case suggesting it is clearly established law that subsequent verbal directives to leave a strip mall parking lot, by both the property owner and police, are insufficient to make the strip mall parking lot, which had multiple "no trespassing" and "customer parking only" signs, arguably not open to the public with respect to Plaintiffs here, none of whom genuinely dispute they were told to leave by both the property owner's security guard as well as police.

With respect to Carter, the Wilson Plaintiffs argue the officers "pulled Carter

---

[31] While there may be a dispute as to whether Plaintiffs previously had permission to be on the premises, there is no genuine dispute they were directed to leave on October 17, 2016.

towards them from the sidewalk and arrested him." ECF No. 177 at 12; *see also id*. at 36 ("Defendants pulled him onto the property and arrested him because they believed he was 'inciting' others, but they charged him with the nonexistent crime of trespass on property open to the public."). Similarly, the Bidwell Plaintiffs argue there was no probable cause for Franklin's arrest for trespass because he was arrested "while on the public sidewalk in front of Los Panchos."[32] ECF No. 178-1 at 50. As pointed out by the El Cajon Defendants, however, the video evidence demonstrates that Franklin and Carter were clearly not on the sidewalk when they were asked to leave, and there is no genuine dispute that Franklin and Carter did not leave, at least not at first. While these facts might not be sufficient for a trespassing conviction, Plaintiffs cite no clearly established law suggesting that every reasonable officer would know it is a constitutional violation to arrest someone for trespass under these circumstances. *See Blankenhorn*, 485 F.3d at 475 (noting that a court's "inquiry is not whether [the defendant] was trespassing" but "[r]ather, . . . whether a reasonable officer had probable cause to think he could have been"). Based on the above, Plaintiffs Box, Vilsaint, Carter, and Franklin have not met their burden of showing the arresting officers violated a constitutional right that was clearly established at the time of their arrests. Accordingly, the El Cajon Defendants are entitled to qualified immunity as to the October 17, 2016 arrests.[33]

### D.   Chief Davis and Sheriff Gore

Defendants argue that Chief Davis and Sheriff Gore are entitled to summary judgment because they were not personally involved in any of the alleged constitutional violations. ECF No. 164-1 at 31; ECF No. 166-1 at 34. In their Opposition, the Wilson

---

[32] The Bidwell Defendants subsequently argue that Franklin "was on or close to the public sidewalk." ECF No. 190 at 11.

[33] Again, in light of the circumstances in the particular case at hand, and as consistent with Plaintiffs' other individual § 1983 claims, it is not necessary to reach the issue of whether Plaintiffs' First and Fourth Amendment rights were violated as a result of the arrests. *See Pearson*, 555 U.S. at 236.

Plaintiffs do not dispute this fact. *See* ECF No. 177. The Bidwell Plaintiffs state they "intend to dismiss Jeff Davis and William Gore in their personal capacity but not in their official capacity, which implicates *Monell* liability." ECF No. 178-1 at 10. The Bidwell Plaintiffs argue that while Chief Davis was not "personally involved," he "acquiesced" to the violation of Plaintiffs' First Amendment rights. ECF No. 178-1 at 47; *see also* 178-3 at 8 ¶¶ 23-24; ECF No. 182 at 9 ¶ 23-24.

"A suit against a governmental officer in his official capacity is equivalent to a suit against the governmental entity itself." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991); *see also Vance v. County of Santa Clara*, 928 F. Supp. 993, 996 (N.D. Cal. 1996) (following other district courts in finding that "if individuals are being sued in their official capacity as municipal officials and the municipal entity itself is also being sued, then the claims against the individuals are duplicative and should be dismissed"). Judge Sammartino also previously warned, "[i]f Plaintiffs bring allegations against Sheriff Gore in his official capacity and against the County, and the two are duplicative, the claims against Sheriff Gore will be dismissed." *See* ECF No. 66 at 5:21-28, n.3.

All of Plaintiffs' claims, except their *Monell* claim, are brought against Chief Davis and Sheriff Gore in both their individual and official capacities. Based on the Bidwell Plaintiffs' representations, and the lack of dispute by the Wilson Plaintiffs, Chief Davis and Sheriff Gore are entitled to summary judgment on all claims brought against them in their individual capacities. Additionally, Plaintiffs' state law claims for violation of the Bane Act and false imprisonment are brought against Chief Davis and Sheriff Gore, as well as their respective municipalities. Accordingly, the claims are duplicative as to their official capacity. *See Luke v. Abbott*, 954 F. Supp. 202, 203 (C.D. Cal. 1997) ("[W]hen both an officer and the local government entity are named in a lawsuit and the officer is named in official capacity only, the officer is a redundant defendant and may be dismissed.").

### E.    *Monell* Liability

Plaintiffs bring a claim against the City and County under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1976). Plaintiffs allege the City and County "violated several of

Plaintiffs' clearly established constitutional rights by improperly declaring an 'unlawful assembly' based on time and/or place instead of whether the assembly was violent or there was an imminent threat of violence." ECF No. 114 at 34 ¶ 149.

"To bring a § 1983 claim against a local government entity, a plaintiff must plead that a municipality's policy or custom caused a violation of the plaintiff's constitutional rights." *Ass'n for L.A. Deputy Sheriffs v. County of Los Angeles*, 648 F.3d 986, 992-93 (9th Cir. 2011). The plaintiff must show "(1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389-91 (1989)). In other words, Plaintiffs must establish that "the local government had a deliberate policy, custom, or practice that was the moving force behind the constitutional violation [they] suffered." *AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012) (citation omitted).

A "policy" is a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008). A "custom" for purposes of municipal liability is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). In other words, a custom is a widespread and longstanding practice that "constitutes the standard operating procedure of the local government entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.* (citations omitted); *see also Koistra v. County of San Diego*, No. 16cv2539-GPC(AGS), 2017 WL 4700073, at *6 (S.D.

Cal. Oct. 19, 2017).

Here, the only policy Plaintiffs point to is a 2013 mutual aid agreement signed by the sheriff and police chief that states that a request for aid requires the approval of the chief law enforcement officer of the requesting jurisdiction. ECF No. 178-1 at 62-63. Based on this agreement, the Bidwell Plaintiffs argue that "Chief Davis and Sheriff Gore are responsible, in their official capacity, for the decisions made under this official policy by their subordinates, thereby implicating *Monell* liability." *Id.* at 63. However, the fact that mutual aid between law enforcement agencies requires the approval of the head of the agency does not mean that Chief Davis or Sheriff Gore, in their official capacities, adopted every act that subsequently occurred so that the act became a policy or custom. Plaintiffs do not point to anything in the mutual aid agreement addressing unlawful assembly declarations, or anything demonstrating an indifference to protesters' constitutional rights.

The Bidwell Plaintiffs also argue "[t]he County and City have a pattern and practice of declaring peaceful assemblies to be unlawful based on their own convenience."[34] ECF No. 178-1 at 63. In support of this argument, they point to: (1) an unlawful assembly declaration on September 30, 2016 at 11:37 p.m. that was based on a fire that turned out to be a barbeque grill; (2) the unlawful assembly declaration around midnight on October 1-2, 2016; and (3) an unlawful assembly declaration on October 16, 2016 at 12:37 a.m. *Id.* at 63-64. However, Plaintiffs do not dispute that some basis, however mistaken, existed for each of the declarations. Moreover, the fact that three unlawful assembly declarations occurred over the span of a four-day time period during a weeks-long demonstration of varying sizes and characteristics is not, under *Monell* jurisprudence, "widespread," "permanent and well-settled as to constitute a custom or usage with the force of law," "standard operating procedure," or the "traditional method of carrying out policy." Plaintiffs cite no authority suggesting otherwise.

---

[34] In their Opposition and Cross Motion, the Wilson Plaintiffs make only passing reference to their *Monell* claim and provide little to no substantive argument supporting their *Monell* claim

Finally, the Bidwell Plaintiffs argue there is evidence that Chief Davis and Sheriff Gore "ratified the decisions of their subordinates." ECF No. 178-1 at 64. In support, Plaintiffs point to evidence that both Chief Davis and Sherriff Gore were kept abreast of developments with the demonstrations and also issued statements that they were "proud of" and "prais[ed]" their officers and deputies. *Id.* Again, these facts do not suggest, and Plaintiffs make no attempt at citing a case supporting the suggestion, that this type of action constitutes ratification of all decisions by subordinates, apparently including past decisions, so that the decisions become policy under *Monell*.[35] Based on the above, Defendants have met their burden of showing that Plaintiffs cannot show a deliberate policy, custom, or practice that was the motivating force behind a constitutional violation, and Plaintiffs have not designated specific facts demonstrating the existence of genuine issues for trial as to their *Monell* claims.[36]

## F.   Plaintiffs' State Law Claims

Certain Plaintiffs also bring state law claims for violation of the Bane Act, California Civil Code section 52.1, and false imprisonment. ECF No. 114 at 36, 40. However, a district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) (citing 28 U.S.C. § 1367(c)(3)). "[I]n the usual case in which all federal-

---

[35] Additionally, as discussed above, it is far from clear that a constitutional violation occurred with respect to the unlawful assembly declaration on the evening of October 1, 2016. While Plaintiffs point to two other unlawful assembly declarations, they do not bring independent claims alleging their constitutional rights were violated as a result of those particular declarations. Plaintiffs do not claim there were any other assemblies before or after the demonstrations in the Panchos parking lot area where the City or County made an unlawful assembly declaration based on "time and/or place instead of whether the assembly was violent or there was an imminent threat of violence." ECF No. 114 at 34 ¶ 149.

[36] The County Defendants also put forth evidence, and identified a lack of evidence, that it was the El Cajon Police Department, not the Sheriff's Department, that made the unlawful assembly declarations. *See* ECF No. 166- at 42. While Captain Turner concurred with the decision, there is no indication, and Plaintiffs cite no authority or evidence suggesting, that a concurrence constitutes a policy by Sheriff Gore.

law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (internal quotation marks and citation omitted). Because Defendants are entitled to summary judgment on all of Plaintiffs' federal claims, the Court, in its discretion, declines to address Plaintiffs' remaining state law claims.

### G. Plaintiffs' Cross Motions for Summary Judgment

Generally, "when simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citation omitted).

Here, however, Plaintiffs' Cross Motions for Summary Judgment are unclear as to which claims they seek summary judgment. Plaintiffs do not distinguish between the issues on which they seek summary judgment and those issues on which they merely oppose summary judgment for Defendants. At the end of the Wilson Plaintiffs' Opposition, for example, they merely state that "[s]ummary judgment should be granted on all counts for Plaintiffs." ECF No. 177 at 36. The County Defendants contend that both Plaintiffs' motions are procedurally defective because they did not file separate memoranda in support of their Oppositions and Motions for Summary Judgment. ECF No. 184 at 28-29. The Bidwell Plaintiffs' reply by noting that the manner in which they filed their briefs was pursuant to Judge Robinson's order, which requested a combined opposition and cross motion. ECF No. 190 at 5 (citing Order, ECF No. 165).

"Because the facts in the record fail to create a genuine issue of material fact to defeat Defendants' summary judgment motions on Plaintiffs' constitutional claims, it follows that this same evidence cannot establish the much higher burden that Plaintiffs are entitled to summary judgment on these same claims." *See Cervantes*, 2020 WL 5759752, at *28. Accordingly, to the extent Plaintiffs' Oppositions are sufficiently

substantive cross motions for summary judgment, Plaintiffs' Motions [ECF Nos. 177, 178] are **DENIED**.

### H.    Request for Judicial Notice

The El Cajon Defendants ask the Court to take judicial notice of: (1) the claim against the City by Farris dated March 30, 2017, and the corresponding May 15, 2017 Denial Letter, lodged as Exhibit O; (2) the claim against the City by Franklin dated March 27, 2017, and the corresponding May 15, 2017 Denial Letter, lodged as Exhibit P; (3) the claim against the City by Preston dated March 27, 2017, and the corresponding May 15, 2017 Denial Letter, lodged as Exhibit Q; and (4) the ECPD Booking Intakes for Carter, Box, Franklin, and Vilsaint (Redacted), lodged as Exhibit R. ECF No. 164-12 at 76–89.

Under Federal Rule of Evidence 201, a court may take judicial notice of a fact that is 'not subject to reasonable dispute,' either 'because it is generally known within the court's territorial jurisdiction,' or because it 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.' Fed. R. Evid. 201(b). To the extent the El Cajon Defendants ask the Court to take judicial notice of the fact that Plaintiffs filed their government tort claims on certain dates, and those claims were rejected, the request is **GRANTED**.[37] *See D.K. ex rel. G.M. v. Solano Cty. Off. of Educ.*, 667 F. Supp. 2d 1184, 1189–90 (E.D. Cal. 2009) (granting the request for judicial notice to the extent the defendants asked the court to take judicial notice of the timely filing and subsequent rejection of the government tort claims); *see also Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) (noting that courts "may take judicial notice of 'records and reports of administrative bodies'").

Similarly, the El Cajon Defendants' Request for Judicial Notice is **GRANTED** to the extent it asks the Court to take judicial notice of the fact that certain Defendants were booked on the dates shown in the booking intake forms by certain officers and were

---

[37] Based on the Court's decision with respect to qualified immunity, however, it is not necessary to reach Defendants' argument that Plaintiffs did not timely exhaust administrative remedies.

charged with the crimes shown. *See, e.g., Dillard v. Roe*, 244 F.3d 758, 768 (9th Cir. 2001), *amended on denial of reh'g* (May 17, 2001) (affirming the trial court's decision to take judicial notice of criminal case filed, which included the booking number of the defendant and his charges).

## IV.   CONCLUSION

For the above reasons, Defendants' Motions for Summary Judgment [ECF Nos. 164, 166, 169] are **GRANTED** as to Plaintiffs' individual 42 U.S.C. § 1983 claims and *Monell* claims. The Plaintiffs' Cross Motions for Summary Judgment [ECF Nos. 177, 178] are **DENIED** as to those claims. Plaintiffs' individual 42 U.S.C. § 1983 claims and *Monell* claims are **DISMISSED with prejudice**. The Court declines supplemental jurisdiction of Plaintiffs' state law claims. Plaintiffs' state law claims are **DISMISSED without prejudice** to being refiled in state court as consistent with state law and procedure. The parties' evidentiary objections, requests for judicial notice, and objections to supplemental authority are resolved as stated above and as consistent with the Court's decision herein.[38] The Clerk of Court is directed to close the case.

**IT IS SO ORDERED.**

Dated:  June 14, 2022

Honorable Linda Lopez
United States District Judge

---

[38] The Wilson Plaintiffs ask the Court to sanction the El Cajon Defendants for filing a document containing confidential personal information. ECF No. 177 at 35. The El Cajon Defendants reply that the one-page document was not redacted "by inadvertence." ECF No. 183 at 26. Given that the offending document was withdrawn, Plaintiffs' request for sanctions is **DENIED**.